Sam MARSHALL, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5624.

Supreme Court of Wyoming.

June 7, 1982.

Sylvia Lee Hackl, Public Defender, Cheyenne, Gerald M. Gallivan, Director, Wyoming Defender Aid, and Valerie Hafner Phifer, Intern (argued), Laramie, signed the brief on behalf of appellant.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., Allen C. Johnson, Sr. Asst. Atty. Gen., and Sharon A. Lyman, Asst. Atty. Gen. (argued), signed the brief of appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

Appellant was convicted of child abuse as that crime is defined in § 6–4–504, W.S. 1977.[1] From the judgment and sentence entered against him he has appealed on two bases. First he argues that there was insufficient evidence presented by the State to support a conviction of child abuse. Second, he challenges the validity of the statute he was convicted of having violated; his contention is that §§ 14–3–101 and –103, W.S.1977[2], impliedly repealed § 6–4–504, W.S.1977.

We will affirm.

---

1. Section 6–4–504, W.S.1977, provides:

"Any adult who intentionally or in reckless disregard of the consequences causes violent physical injury or mental trauma to a child under the age of sixteen (16) or commits any assault or assault and battery upon the child to a degree as to require medical, psychological or psychiatric treatment to heal or overcome the injuries or damages sustained by the child, or who sexually molests a child under the age of sixteen (16) is guilty of child abuse and upon conviction shall be sentenced to the state penitentiary for a term of not more than five (5) years."

2. Section 14–3–101, W.S.1977:

"(a) No parent, guardian or custodian of any child shall:

"(i) Abandon the child without just cause;

"(ii) Abuse, torture, expose or cruelly punish the child; or

"(iii) Knowingly or negligently cause, permit or contribute to the endangering of the child's life, health or welfare."

Section 14–3–103, W.S.1977:

"(a) Any person violating any provision within W.S. 14–3–101 and 14–3–102 is guilty of a misdemeanor and upon conviction shall be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) plus court costs or imprisoned in the county jail nor more than one (1) year, or both.

"(b) Upon the second and each subsequent conviction of subsection (a) of this section, a person shall be imprisoned in the state penitentiary not more than five (5) years."

On the night of April 13, 1981, appellant, along with his wife, aunt and another individual, traveled from appellant's home in Saratoga, Wyoming to a hospital in Rawlins in order to get medical treatment for appellant's twenty-two month old stepson. Once there, the child was admitted and treated for second degree burns which were located on his left buttocks and leg.

According to appellant and his wife, these burns had occurred on the night of April 10, 1981 while the child was home alone with appellant. Appellant testified that the youngster ate his dinner during this period getting food all over himself in the process; so appellant took him into the bathroom for a bath, running water into the tub and testing it before use. Appellant claimed to have left the child alone in the bathtub for a period of time. Appellant went to the kitchen where he cleaned up the mess the child had made while eating—chili beans and wieners were thrown all over the floor and the highchair. When he heard the child screaming, he returned to the bathroom where he found the hot water faucet on and the child at the back end of the tub. After he turned the water off and pulled the youngster from the bathtub he noticed that the child had been burned. He checked with his aunt, who lived a couple of doors away, for advice. She gave him a tube of burn medicine which he took home and applied.

Appellant's wife testified that when she arrived home she popped several blisters which had formed with a sterilized needle and applied some additional medication. The next morning she asked a druggist what he recommended for burns. He indicated that if the burns had scabbed over, the battle was pretty much over; however, the burns should be kept moist and the child should be given plenty of liquids. Appellant and his wife testified that, since the burns had scabbed over, they did not believe additional medical treatment was necessary.

It was only on Monday, April 13, when the scabbing stuck to the sheets and was pulled off, that they again became concerned. Appellant's aunt viewed the burns and insisted that immediate medical treatment be sought. The aunt even called appellant's mother in Texas. She called back to her son and told him to take the child to the hospital or she might call the sheriff. A friend of the aunt also looked at the burns and agreed that immediate medical attention was needed. After the local doctor refused to see the child, the aunt got her car and drove the child, along with appellant, his wife, and the friend, to the hospital in Rawlins. After their arrival at the hospital, an attending physician called the sheriff's office believing the child may have been abused. A deputy sheriff went to the hospital and conducted an investigation. Later he arrested appellant on charges of child abuse.

Appellant was officially charged with child abuse under § 6-4-504, supra. Appellant's trial commenced on May 28, 1981. At the close of the State's case a motion for acquittal was made; however, the trial judge denied the motion. The defense then presented evidence but never renewed the motion for acquittal. At no time during the course of the proceedings in the district court did appellant challenge the validity of § 6-4-504, W.S.1977. On Saturday, May 30, 1981, a jury returned a verdict of guilty. Appellant was later sentenced to the Wyoming State Penitentiary for a period of not less than two years nor more than five years; however, the trial judge suspended this sentence in favor of three years of supervised probation and a fine of $1,000.

◼ The first assignment of error in this case questions the sufficiency of the evidence to support a guilty verdict. Specifically appellant contends that it was error for the trial judge to deny his motion for acquittal which had been made at the close of the State's case. However, since appellant introduced evidence following the motion for acquittal, the motion must be viewed as waived unless later renewed. *Neilson v. State*, Wyo., 599 P.2d 1326 (1979). Since there was no renewal of the motion, this court may only review the trial court's failure to acquit to determine whether it was plain error.

The doctrine of plain error has been thoroughly discussed by this court on numerous occasions. This court may reverse where "[p]lain errors or defects affecting substantial rights" are found to have occurred. Rule 49, W.R.Cr.P. However, before noticing the error, this court must find that (1) the record clearly shows the alleged error; (2) the error violated a clear and unequivocal rule of law in an obvious way; and (3) material prejudice resulted. *Browder v. State*, Wyo., 639 P.2d 889 (1982).

The sufficiency of the evidence, where there is a conflict, is tested in accordance with the criteria set out in *Harvey v. State*, Wyo., 596 P.2d 1386, 1387 (1979):

"The oft-repeated rule by which we test the sufficiency of evidence on appeal of a criminal matter is that we examine and accept as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith, and we give to the evidence of the prosecution every favorable inference which may reasonably and fairly be drawn therefrom. Stated another way—it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State. *Evanson v. State*, Wyo., 546 P.2d 412 (1976); *Brown v. State*, Wyo., 581 P.2d 189 (1978); *Nisonger v. State*, Wyo., 581 P.2d 1094 (1978)."

One of the considerations which we must also keep in mind is what we cannot see or hear, but of which the jury has the benefit—being present and observing at first hand the demeanor and expressions of the witnesses. As said in *Madrid v. Norton*, Wyo., 596 P.2d 1108, 1117 (1979):

" * * * We must not forget that when we examine the cold words of the transcript of testimony, we do not have the benefit of how the trial judge [jury] sees and hears the witness—the pitch of the voice,

facial changes, the movement in the witness—all of which may tell a separate story, to be given credence. The conclusion of what preponderates is with the trier of fact. *Koch v. Brown*, Wyo.1965, 401 P.2d 459. Credibility of witnesses is for the trial court [jury]. *Hench v. Robinson*, 1955, 75 Wyo. 1, 291 P.2d 417; *Eblen v. Eblen*, 1951, 68 Wyo. 353, 234 P.2d 434. Appellate courts cannot try a case de novo. *Marken v. Goodall*, 10th Cir. 1973, 478 F.2d 1052." (Footnote omitted.)

As pointed out by the prosecutor in his closing argument to the jury, child abuse is a very private act; those present are usually only the victim and the perpetrator and many times, as in the case before us, only one can talk. While a youngster of twenty-two months can communicate hunger, thirst, pleasure, pain, fear and other understandable messages by body language, he cannot testify and give his version of the occurrence, so circumstantial evidence must be relied upon. This type of case is usually presented of necessity by circumstantial evidence. *Grabill v. State*, Wyo., 621 P.2d 802 (1980); See also, *United States v. Harris*, 661 F.2d 138 (10th Cir. 1981), a child abuse case arising at F. A. Warren Air Force Base, Wyoming and prosecuted under § 6-4-504, supra. But, circumstantial evidence has standing and is sometimes more reliable than direct evidence. It is measured upon the same basis as direct evidence. In *Blakely v. State*, Wyo., 542 P.2d 857, 862 (1975), we said:

" * * * Circumstantial evidence has been unfairly maligned and misunderstood by both some of the judiciary and lay people and has not been given the respect to which it is entitled. Circumstantial evidence has 'both standing and stature.' Without it, the guilty would escape. It must not be given inferior status. The careful bonding together of facts passes the test of logic: If this and this and this are true, then that must be true." (Footnotes omitted.) [3]

---

3. The trial judge so instructed the jury in approved form (2.101, Wyoming Pattern Jury Instructions, Criminal):

"There are two types of evidence from which you may find the truth as to the facts of a case—direct and circumstantial evidence.

The medical doctor, a member of the American College of Emergency Physicians with a background of examining and treating many burn cases, examined the child upon admission to the hospital. He testified that when he examined the child from head to toe, there were second degree burns over the left buttocks, the left posterior thigh, and the left ankle. The burn around the ankle was almost completely around the ankle except for a small part on the inside of the ankle. There was also a burn on the inside of the right thigh. In addition, there were several bruises on the child. They were about the right upper eyelid, the left forehead, on the bridge of the nose, the anterior chest wall, in the small of the back and also a bruise completely around the right lower leg just above the right ankle.

Color photographs show a massive burn on the left buttocks extending down onto the thigh. The photos also show the ugly large burn around the left ankle. Medical testimony was that the burns were consistent with hot liquids, such as water, coffee, grease or oil being poured on the child.

The bathtub was four feet long, twenty-two inches wide and ten inches deep. The faucet handles were sixteen inches above the bottom of the tub and the spout—three inches lower—discharged straight down into the drain. There is no question but that the 170 degree water in the hot water line would cause second degree burns. During the course of the testimony, every possible explanation of how the child could have received the burns in the locations they appeared by his own act of turning on the

hot water was explored. None fit the burn pattern.

The theory of the appellant was that when the child turned on the hot water faucet he attempted to escape to the back of the tub and in doing so got his backside burned. The location of the spout might explain an ankle burn but not all the way around the ankle and certainly not the backside burns. It must be kept in mind that, according to appellant's own version, there was already water of a cooler temperature in the tub.

The various bruises around the child's head were explained by appellant as having been caused by the manner in which he had to remove the child from the tub. It is his contention that the baby gave him such a struggle that he found it necessary to yank the child out of the tub by getting a hold on his head. It was pointed out in closing argument that the evidence showed the child was an active toddler and could have climbed out of the tub on his own.

Appellant, during his testimony, explained the bruise on the child's lower chest as having occurred during a potty-training experience. The tot did not make it to the toilet and messed his pants. On that occasion, by appellant's testimony during trial, he "patted" him with the back of his hand.[4] Appellant gave two stories as to a bruise in the vicinity of the eye. One was that the family dobberman pup had nipped him during play and the other was that it happened when he fell off the car seat.

The long delay in getting the child to the hospital, and then only after much persua-

Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness; circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should weigh all the evidence in the case and if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty. If on the other hand, you are convinced of the guilt of the defendant be-

yond a reasonable doubt, you must find him guilty."

4. The deputy sheriff testified in that regard during trial:

"A. When I asked about the bruises that I knew of on the chest area, he told me that he had struck him, the baby, meaning John, in the chest with the back of his hand; and then he hesitated and he looked at the floor for approximately a minute. He looked back up and he said, 'But I just pushed him. We were playing.'"

sion by relatives and friends, is a further circumstance worthy of consideration.

■ Appellant admitted during his direct examination that he had been convicted of a felony, passing of bad checks. Rule 609(a), W.R.E.:

"For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one (1) year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment."

Trauma, consistent with child abuse, coupled with an opportunity to inflict the injuries as in this case, satisfies us that the jury was justified in accepting the circumstantial evidence against appellant rather than his denial; and there was a basis for the jury to find appellant guilty beyond a reasonable doubt.

After carefully reviewing the evidence in this case we cannot find any plain error. Submission of this case to the jury did not violate a clear and unequivocal rule of law. The whole basis of our legal system depends upon the submission of questions of fact to juries and allowing them the opportunity to decide what occurred. Here that was done.

■ The second issue raised by appellant focuses on the validity of the statute he was convicted of violating. Even though no challenge was made to the statute at trial, the plain-error doctrine is inapplicable. That is because the validity of § 6–4–504, supra, is jurisdictional in this case. As this court has previously stated:

"Jurisdiction of the offense charged and of the person of the accused is a fundamental and indispensable prerequisite to a prosecution. In the absence of jurisdiction over both the offense and the person there is and can be no prosecution. [Cita-

tions.]" *State v. Clark*, Wyo., 392 P.2d 539, 540 (1964).

Accordingly, we must carefully consider appellant's argument.

Appellant's position is that the legislature's passage of §§ 14–3–101 and –103, supra, impliedly repealed § 6–4–504, W.S. 1977. However, this court has previously noted that repeals by implication are not favored. *Thomas v. State*, Wyo., 562 P.2d 1287 (1977). In fact a fairly strict test has been devised to determine whether the statutes can co-exist together. "[I]f they are repugnant by virtue of relating to the same subject and are directed at a distinct offense with the same object, the earlier cannot stand." *Thomas v. State*, supra, 562 P.2d at 1290.

There are several differences between these questioned statutes. Section 6–4–504 speaks to any adult while §§ 14–3–101 and –103 specifically cover only parents, guardians and custodians. Also, § 6–4–504 defines the perpetrator of the crime as one "who intentionally or in reckless disregard of the consequences causes violent physical injury or mental trauma to a child under the age of sixteen," while §§ 14–3–101 and –103 prohibit the abuse, torture, or cruel punishment of a child by a parent, guardian or custodian. It would appear the latter statute is directed more towards corporal punishment which gets out of hand, while the former covers intentional abuse. This is consistent with the fact that violation of §§ 14–3–101 and –103 is a misdemeanor, but violation of § 6–4–504 is a felony. We cannot say, in light of these glaring differences, that these statutes are directed at the same offense with the same objective, in fact quite the contrary appears to be true. We must presume that if the legislature wanted § 6–4–504 repealed, it would have done so itself. Accordingly, we hold both statutes valid.

Affirmed.

THOMAS, Justice, specially concurring.

I agree with the majority of the court that Marshall's conviction must be affirmed. I am in complete accord that there

has been no repeal by implication of the criminal statute under which he was charged. I agree that the trial court properly denied the motion for judgment of acquittal because in my view the evidence was sufficient under the prior decisions of this court to make a prima facie case. *Rinehart v. State*, Wyo., 641 P.2d 192 (1982) (Thomas, J., specially concurring, and cases cited in the concurring opinion).

I do have some concern about the rule that the motion for judgment of acquittal is to be viewed as waived if the defendant proceeds to introduce evidence in his own behalf. Upon reflection, this rule strikes me as an anomaly in our criminal jurisprudence. No one in our society has any serious quarrel with the requirement that in a criminal case the accused must be proved guilty beyond a reasonable doubt. We support with unanimity our constitutional requirements that one cannot be forced to be a witness against himself. The application of the rule, however, does interfere with an unfettered opportunity by the defendant to test whether the State has met its burden at the close of the State's case. See *Jacobs v. State*, Wyo., 641 P.2d 197 (1982). The thrust of the rule with respect to waiver of a motion for judgment of acquittal if the defendant introduces evidence well may be that a defendant is legally coerced into presenting evidence because of uncertainty about the validity of his motion position; such evidence well could be his own testimony; and that evidence can be relied upon to establish his guilt. If he chooses to rely upon his motion, the presentation of a viable defense could be chilled by the application of this rule.

The United States Court of Appeals for the Tenth Circuit has summarized the problem in this manner:

"The waiver rule thus places defendant on the horns of a dilemma if he believes his motion for acquittal made at the close of the government's case was erroneously

denied. He can rest his case, thereby preserving his appeal, and face the risk of a conviction which may not be reversed, or he can present evidence of his innocence, thereby waiving his appeal from the original ruling, and assume the risk that this evidence may provide the missing elements in the prosecution's case." \* \* \*." *United States v. Lopez*, 576 F.2d 840, 842 (10th Cir. 1978).

I recognize that the rule set forth in the majority opinion is by far the majority rule in this country. I would agree that the application of the rule probably does result in some convictions being attained which otherwise might not have been, and those convictions being sustained upon appeal where otherwise they might not have been. I am not sure that the number of those cases ever would be very large. It does seem to me, however, that a better solution to that problem would be to assure that we had more able prosecutors who would have the assistance of sufficiently adequate investigative resources that the prosecution could present a prima facie case and achieve a conviction without the necessity of relying upon the defendant's evidence filling the holes in the prosecution's case. I note that other courts and judges have wondered about the fairness and desirability of this rule. *United States v. Burton*, 472 F.2d 757 (8th Cir. 1973); *United States v. Rizzo*, 416 F.2d 734 (7th Cir. 1969); *Cephus v. United States*, 117 U.S.App.D.C. 15, 324 F.2d 893 (1963). *State v. Bacheller*, 89 N.J.L. 433, 98 A. 829 (1916). See also *State v. Rocker*, 52 Haw. 336, 352, 475 P.2d 684 (1970) (Levinson, J., dissenting); *State v. Smith*, La., 332 So.2d 773 (1976) (Calogero, J., dissenting); and *Newell v. State*, Wyo., 548 P.2d 8 (1976) (McClintock, J., dissenting).

ROSE, Chief Justice, dissenting.

In my opinion, the motion for judgment of acquittal [1] should have been granted and

---

**1.** Rule 30(a), W.R.Cr.P., reads:
"Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall

order the entry of judgment of acquittal of one (1) or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense

I find the majority of the court to be in error when they hold that there is sufficient evidence in the whole record to sustain the guilty verdict and judgment entered thereon.[2]

I would have reversed.

The defendant was charged with violating § 6-4-504, W.S.1977.[3] It therefore became the State's obligation to prove each of the following elements beyond a reasonable doubt—i.e., that the appellant

(1) intentionally or recklessly caused

(2) violent physical injury

(3) upon the person of his stepson,

(4) said stepson being under the age of 16.

*Chavez v. State*, Wyo., 601 P.2d 166 (1979). In *Russell v. State*, Wyo., 583 P.2d 690, 694 (1978), we quoted with approval *United States v. Bethea*, 143 U.S.App.D.C. 68, 442 F.2d 790, 792 (1971), saying:

" 'In this jurisdiction, "[a] motion for acquittal must be granted when the evidence, viewed in the light most favorable to the Government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." [Citations omitted.] If the evidence is such that a reasonable man may have a reasonable doubt as to the defendant's guilt, the case should go to the jury. [Citations omitted.] On the other hand, the trial judge should not allow the case to go to the jury if the evidence is such as to permit the jury to merely conjecture or to specu-

late as to defendant's guilt.' " (Emphasis added.)

We also said in the *Russell* opinion, 583 P.2d at 694:

"A motion for judgment of acquittal enjoins the trial judge in passing on a motion—for—acquittal to

" ' * * * determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.' *Curley v. United States*, 1947, 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232-233, cert. den. 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850, reh. den. 331 U.S. 869, 67 S.Ct. 1729, 91 L.Ed. 1872.

" ' * * * For this purpose, [ruling on a motion for acquittal] the judge must "assume the truth of the Government's evidence and give the Government the benefit of all legitimate inferences to be drawn therefrom." If the evidence,

or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the state is not granted, the defendant may offer evidence without having reserved the right."

2. I understand that the defendant waives his motion-of-acquittal rights when the motion is denied and he chooses to go forward with his case as he did here (see Justice Thomas' separate specially concurring opinion), but the motion for acquittal and the sufficiency-of-the-evidence issues have the common denominator which says that the verdict of guilt cannot stand where the elements of the crime are not proven beyond a reasonable doubt. Both the motion and the validity of the verdict and judgment ask the question: Was the evidence suffi-

cient? With this thought in mind, I have discussed the issues separately.

3. Section 6-4-504, W.S.1977 provides:

"Any adult who intentionally or in reckless disregard of the consequences causes violent physical injury or mental trauma to a child under the age of sixteen (16) or commits any assault or assault and battery upon the child to a degree as to require medical, psychological or psychiatric treatment to heal or overcome the injuries or damages sustained by the child, or who sexually molests a child under the age of sixteen (16) is guilty of child abuse and upon conviction shall be sentenced to the state penitentiary for a term of not more than five (5) years."

so measured at the point in the prosecution to which the motion is properly addressed, portends to establish guilt beyond a reasonable doubt, it is for the jury to make the decision as to whether it actually does.' *Powell v. United States*, 1969, 135 U.S.App.D.C. 254, 257, 418 F.2d 470, 473."

In *Russell* we went on to observe:

"The trial judge must determine whether, '[v]iewing cumulatively the totality of the evidentiary items touching on the issue, the jury could reasonably have inferred * * *' guilt. See generally 8A Moore's Federal Practice—Criminal Rules, ¶ 29.06, pp. 29–24 to 29–36."

In discussing the motion-for-acquittal ruling, I write with these rules in mind, together with the understanding that the question raised by the acquittal motion must be decided within the discretion of the trial court (*Montez v. State*, Wyo., 527 P.2d 1330 (1974)), and that it should not be granted when there is substantial evidence to sustain the charges (*Fresquez v. State*, Wyo., 492 P.2d 197 (1971); *Opie v. State*, Wyo., 389 P.2d 684 (1964)). This court on review has the same obligation. *Chavez*, supra. The jury may not, however, conjecture or speculate upon defendant's guilt in order to arrive at a guilty verdict. *Russell*, supra, and *Chavez*, supra.

In sum, the rule which must be said to guide the trial and this court in contemplating the 30(a) question is this:

Assuming the truth of the State's evidence and giving the State the benefit of all the legitimate inferences to be drawn therefrom, the motion must be granted if the State has failed to prove *any* of the essential elements of the crime beyond a reasonable doubt, i.e., when the evidence is such that

" * * * a reasonable juror *must* have a reasonable doubt as to the existence of

*any* of the essential elements of the crime." (Emphasis added.) 601 P.2d at 170.

Furthermore, the nature of the evidence which will sustain the court's denial of a motion for acquittal must not be such as to permit the jury to indulge in conjecture and speculation.

### Condition of the Evidence at the End of the State's Case

Of the elements of the crime that the State was compelled to prove, only one is at issue, i.e., whether or not the defendant " * * * intentionally or in reckless disregard of the consequences [caused] violent physical injury * * * " (supra, n.3) to the child.

Preliminarily, it is to be remembered that we are confronted with a proof problem which contemplates the interplay among the physical facts pertaining to the bathtub area, the reflex action and reaction of a child to his burns, and the child's ability or inability to perform acts which could culminate in his inflicting injury to himself. Our task is made heavier because nobody (except the child) saw what happened in the bathtub and the only expert opinions that are contained in the record were proffered by witnesses who were *nonexperts* in the area in which their opinions were tendered.[4] We therefore find ourselves playing uninformed guessing games about what could or could not have occurred, given the known, the unknown, the possibilities and the probabilities with which we are confronted.

As a predicate to these considerations, it is well to review the rule of law that has evolved from this court in child-abuse cases.

Without citing authorities, the majority opinion says, at p. 799:

"*Trauma, consistent with child abuse, coupled with an opportunity to inflict the injuries* as in this case, satisfies us that

---

**4.** I do not mean to demean the efforts of the doctors who testified in the case, except to say that they were asked to testify, were permitted to testify and *did* testify as experts upon subjects that were not even remotely related to the area of their professional expertise. Therefore,

their testimony with respect to nonmedical subjects, such as the reconstruction of the burning of the child, is no more competent or credible than that of any other uninformed or untrained witness.

the jury was justified in accepting the circumstantial evidence against appellant rather than his denial; and *there was a basis for the jury to find appellant guilty beyond a reasonable doubt.*" (Emphasis added.)

Not only is there insufficient evidence in this record to find the defendant guilty beyond a reasonable doubt under this rule, but the evidence is also insufficient to establish guilt under our previous child-abuse holdings. I go on to suggest that the rule announced by the majority is patently erroneous and that a review of the child-abuse cases from this court will point up the error.[5] The majority's proffered rule is erroneous because the rule surely must be—*at the very least*:

"Trauma, consistent [*only*] with child abuse, [as established by expert testimony] coupled with an opportunity to inflict the injuries * * *" (Bracketed matter and emphasis added),

will be sufficient to convict under § 6–4–504, W.S.1977, supra.[6]

If the word "only" is not ground into the concept, and if the expert-testimony factor contemplated by the Thomas summary (supra, n.5) is not included, the enforcement of the rule announced in the majority opinion would permit a conviction to stand where there was opportunity plus a black eye which the doctor says could have been inflicted either by an adult intentionally or recklessly causing violent physical injury or by the child accidentally falling out of the highchair. The black eye from the fall is "consistent with child abuse," even though this might not have been the way it was received. Our previous decisions are in accord with this criticism.

In *Grabill v. State*, Wyo., 621 P.2d 802 (1980), the mother left the baby with the defendant at 1:00 p. m. She had been with the child before that time and had not observed a bruise over the ear. When she returned from shopping at 3:00 p. m., the bruise was present, and only the defendant had been with the child during this period of time. The doctor testified that the child had received nonaccidental trauma resulting in brain injury—that babies cannot incur the kind of injury the doctor observed from falling off the couch, a table, etc., that the ferocity of the injury was manifest not only from the appearance of the bruise itself, but from other signs such as blood in the eyes, swelling of the brain and convulsions, all of which were meaningful to the doctors in the context of the force and nature of the trauma received. Given these facts and the competent medical opinion that the trauma was nonaccidental, we held that the motion for acquittal should be denied.

I draw attention to *Grabill v. State*, supra, because there we had the elements of opportunity, trauma *and medical expert testimony to the effect that the child's trauma could not have been incurred except through the kind of violent treatment that only the defendant had the opportunity to administer.* It is this last-mentioned factor that is absent in the rule of law proffered by the majority in the case at hand. Here we have medical witnesses reconstructing a burn sequence, when they are not expert in the field of accident reconstruction. They are not saying here, as the doctors did in *Grabill*, that, based upon medical deduction, it is their opinion that the trauma to the body of the child was not accidental. Here they purport to assume that the infliction of the burns was capable of being delivered either by the child through accident or by the intentional acts of the defendant, and

---

5. Justice Thomas summarized the rule in his ⌐pecially concurring opinion in *Rinehart v. State*, Wyo., 641 P.2d 192, 194, when he said:

"As I understand prior cases before this court, *trauma, which according to expert testimony was inflicted by abusing the child*, coupled with an opportunity to inflict the injuries, is sufficient evidence to sustain a conviction. *Grabill v. State*, Wyo., 621 P.2d 802 (1980); *Seyle v. State*, Wyo., 584 P.2d 1081 (1978); and *Jones v. State*, Wyo., 580 P.2d 1150 (1978)." (Emphasis added.)

6. This still does not take into account the situation where more than one adult has the "opportunity" to inflict the injury. Whom are we going to charge then? The rule should also include the notion that *only* the defendant had the opportunity.

then the witnesses step out of their role as doctors to offer conclusions in areas in which they are not qualified as experts. This is highly improper and can only mislead the jury into the rankest sort of prejudicial speculation and conjecture. Also see *Seyle v. State*, Wyo., 584 P.2d 1081 (1978) and *Jones v. State*, Wyo., 580 P.2d 1150 (1978).

In *Rinehart v. State*, Wyo., 641 P.2d 192 (1982), where we were concerned with manslaughter of an 11-month-old child, the record revealed injury and opportunity together with the doctor's testimony to the effect that the cause of death could only have come about through acts consistent with severe shaking of the child which produced tears in the blood vessels connecting the dura, resulting in subdural hematoma and severe brain swelling. The pathologist testified that death was due to cerebral edema. Again, consistent with *Grabill*, supra, we upheld the guilty verdict on the ground that only the defendant had cared for the child at a time when injuries were inflicted which were nonaccidental in nature. In fact, the kind of injuries observed were such as, according to the doctors, could only have been inflicted by a physical assault in the nature of child abuse.

The rule which the majority opinion adopts in the instant matter is faulty because it does not include the concept that the trauma must be established by expert testimony in order that it be considered to be consistent with child abuse before the evidence will be regarded as sufficient to uphold a conviction. When the majority say "trauma consistent with child abuse" the clause is so broad as to include trauma which—although consistent with child abuse—may well not have been delivered by one who has abused a child. We must work into the rule such language as will identify the trauma to be such that *only* the defendant could have administered it—otherwise we will continue to find ourselves in the dilemma with which we are confronted in this case. That is, we will find ourselves being called upon to uphold convictions which come from situations where the trauma may be "consistent with child abuse" but is also consistent with other causes.

I do not pass upon whether this court has or has not gone too far in *Grabill, Jones, Seyle* and *Rinehart*, but *I do say* that it makes no difference whether the rule of law is as was established by the majority of this court in those opinions or whether it is the rule announced in the case at bar; the fact is that the evidence in this case is insufficient to uphold a conviction in either event.

The element that is absent here is the doctor's competent testimony (i.e., where the doctor is testifying in the area of his expertise) that the trauma could not have been inflicted except through the defendant's intentional acts or his reckless disregard of the consequences. Such evidence was present in all the other child-abuse cases but it is not present here and, under the rule announced, is not required. Its absence precludes the jury from concluding beyond a reasonable doubt that the injury was inflicted intentionally or recklessly. Where there is opportunity for accidental trauma and an absence of competent, qualified expert testimony that the injury was nonaccidental, it would seem to me to be an irrebuttable fact of logic that, in such circumstances, " * * * a reasonable juror *must* have a reasonable doubt as to the existence * * * " of the element of the crime which is described by the statute as the infliction of "violent physical injury" through the [intentional] or reckless disregard of the consequences," (supra, n.3) (emphasis added). The expert opinions contained in this record absolutely force a jury to guess, speculate and conjecture as to whether the burns were inflicted by the defendant or in some other way, and they preclude a jury reaching a decision on the controversial element of the crime beyond a reasonable doubt.

The only evidence offered on the issue of whether the child could have turned on the faucet and scalded himself was the testimony of the doctors. They undertook to constitute themselves as reconstruction experts in order to reach conclusions casting doubt upon the little boy's ability to inflict his

own burns in the bathtub under the conditions described by the defendant. Why they were permitted to offer their opinions in this area of their nonexpertise, I will never know. Theirs were not medical opinions in any sense of the word. They looked at the location of the burns on the body of the child and, from these observations, together with misinformation about the child's age, the physical facts pertaining to the bathtub, and by employing pure guesswork as to the time sequence of the burning process, they undertook to reconstruct a nonmedical physical-fact incident in order to reach the conclusion that the child could not have been burned in the way the defendant described the mishap to a police officer.

The record discloses that one of the doctors testified about how an 18-month-old child could be expected to react in a given set of circumstances when the child in this case was actually 22 months old. The same doctor also testified about an "ordinary" bathtub, when this tub was not "ordinary" in that the faucet was not located where the witness thought it was—a fact which, under the State's theory of the case, is critical because it has to do with whether the youngster did or did not receive the burns in the manner described by the defendant. A review of the testimony is illuminating in this regard:

"Q. * * * There has been testimony before this Court in terms of the story that Sam Marshall told the various people in terms of how these burns occurred. Essentially, these stories come down to this child being present in a bathtub in a mobile home, in a bathtub partially filled with water, and the child accidentally turned on the hot water. Doctor, my question to you is, is the pattern of those burns that you observed on that child consistent with that version of how these burns occurred?

"A. *One would have to take a look at the bathtub. Ordinarily, * * *.*" (Emphasis added.)

The record reveals that the doctor did *not* look at the bathtub and went on to make false assumptions about the tub's physical properties which, when related to the child's size, age and hypothesized positions in the tub, caused the doctor to formulate inaccurate conclusions.

The doctor proceeded to guess and assume that appellant's bathtub was "ordinary" in order to discredit the theory that the location of the youngster's burns could be explained by the child having stood up and turned on the hot water, or by the child having reached the faucet from a sitting position. Another doctor had testified to this same effect, having admitted no knowledge of the circumstances surrounding the burn incident except for his unfounded assumption that the child had been "sitting" in a bathtub. In addition, one of the doctor's "expert opinions" was premised on his misconception of the child having been 18 months old when in fact he was 22 months old at the time of the burn incident.

Relevant direct examination of this doctor goes like this:

"Q. * * * Let me ask the question that I thought had been answered before, then, Doctor. How many alternative ways are there for a child to turn the water on in a bathtub?

"A. He can be sitting, standing, kneeling. *It depends on the height of the faucet, number one.* If he is standing, we explained the burns should be on the front of the child. These were not. If he is sitting, this could explain the burn on the ankle, but it would not explain the burn on the buttocks.

"Q. Okay. The third alternative being kneeling, are those patterns of burns consistent with that kneeling aspect, the third alternative?

"A. No, it is not. Again, if a child is kneeling, he will be burned in the front and usually higher on the chest *because of the position of the faucet coming into the tub.*" (Emphasis added.)

The doctor went on to imply that the location of the child's burns might otherwise have been explained by assuming that he was in a kneeling position when he came in contact with the hot water:

"A. The only way the child could have received the burns on the buttocks is * * with the left side up with the water running on the hip area. Okay. If one bends the ankle up all the way to the buttocks, the burns come closer to each other in relationship. But that would mean that the time of the burns would be that the leg was bent clear up to the child's buttocks."

There was no evidence introduced into the record to support the assumptions made by the medical experts that the bathroom area in appellant's trailer was "ordinary," and the doctors admittedly did not know the position or positions of the child when he came in contact with the hot water. They did not know whether the burns occurred simultaneously or at various intervals of time. One of the doctors, when asked how the injury occurred, said:

"I cannot relate exactly how this injury occurred."

Uncontradicted testimony established that the age of the child when receiving the burns was 22 months—that he was tall, stout and very active for his age. The record shows that the bathtub in appellant's trailer was unusually narrow with fixtures (faucets and spigot) extraordinarily low or close to the bottom of the tub. Therefore, the facts assumed by the doctors were critically untrue, critically inaccurate and critically insufficient to support hypothetical conclusions from witnesses who were not qualified to draw them in the first place.

I would make one last point on this issue. In premising their opinions, the so-called experts (the doctors) made an underlying assumption that I do not think is justified. They talked about the location of the burns on the child's body as being inconsistent with the appellant's explanations of the incident. The assumption was that the defendant's version would necessarily have placed the child in a standing, sitting, or kneeling position when he was burned. Given this assumption, it is concluded by the doctors that the burn locations are inconsistent with the child being in any of these positions when the burns were received.

For example, the doctors say that they can understand the burn on the buttocks if the child is standing, but then it is impossible for them to explain the burn on the ankle because it would have been under the tepid water which the defendant had run for the child's bath, etc.

But these deductions assume a fact that is not integral to the defendant's explanation—namely that the burns occurred simultaneously. Thus, the hypothesis tends to become its own reality but it does not make room for the real probability that the burns were received at varying intervals of time. Picture with me the scene where the child is standing—or kneeling—or sitting—turns on the water, receives the heat impact on his buttocks—frantically tries to escape, slips, the feet go up and the burn to the ankle is received, as are other burns during the child's desperate escape efforts. There is no license in this case for the doctors to assume simultaneous burns in order to reach their conclusions that the defendant's version was untruthful. That these burns were received during the course of fright and escape is far more logical than that they were received all at the same instant. In this regard, the doctor testified as follows:

"Q. And noticing those burns, Doctor, are you assuming that those happened simultaneously?

"A. The burns are aged about the same, yes.

"Q. But my question is not they are about the same age, I am asking you if you would tell us in what sequence those happened or if they happened simultaneously, from your examination.

"A. I can tell you that they are both approximately 48 hours old. *And whether they happened within seconds or minutes or hours, I cannot tell you.*

"Q. So the answer is no?

"A. That is correct.

"Q. *You can't tell us whether the burn on the left buttocks happened one minute and then five seconds later the burn around the ankle, can you?*

"A. *No, sir.*

"Q. *And you can't tell us can you, Doctor, in what order those burns occurred?*

"A. *That is correct.*

\* \* \* \* \* \*

"Q. And that is exactly what I am asking you about because what I am asking you now is, *is it possible that those burns were received in different time sequences while the baby was in different positions?*

"A. *That's possible.*

"Q. Well, that's the only possible explanation we've had so far because everybody has told us—

"MR. WILLIAMS: Objection, Your Honor.

"THE COURT: That's right. You don't need the editorial comment. Just ask the questions.

"MR. HOKE: Thank you.

"Q. (BY MR. HOKE) *Is it possible that the bruises and burns would be consistent with the baby falling or trying to retreat from the hot water source?*

"A. *The bruises certainly could come from a fall or by retreat from the hot water source to get the burns.* \* \* \*"

(Emphasis added.)

On redirect examination, the following dialogue occurred:

"Q. Doctor, *I think on Cross Examination it has been established that you are not in a position to testify beyond a reasonable doubt that all these burns occurred simultaneously; is that correct?*

"A. *They could have occurred at different times within an hour or so, but they are dated approximately 48 hours at the time we saw them.*" (Emphasis added.)

If the State cannot rely on the simultaneous-burn concept, upon the incorrect age of the child and upon the inaccurate bathtub-physical-fact assumptions, then it cannot rely upon the doctors' theory about why the burns could not have happened in the way the defendant said they did.

The testimony of the doctors in this case was pure speculation and guesswork on the part of nonexperts. I say "nonexperts" in the sense that the conclusions called for were not of a medical nature but rather were conclusions and opinions that only a reconstruction expert could reach—*given the true facts*—which in this case were not made available to these doctors.

Parenthetically, there is no evidence in the record to indicate that the bruises were caused other than by accident—the doctors did not even purport to offer an opinion on this issue. The kinds of bruises found on the child are as consistent with accidental infliction as they are nonaccidental, intentional or reckless conduct causation. For these reasons, the bruises cannot be considered as evidence upon which a jury could reach a child-abuse verdict finding guilt beyond a reasonable doubt.

Given those various inaccuracies, these false assumptions and these false conclusions, and, given the fact that these witnesses were anything but expert in the area in which they were called upon for opinion evidence, I would conclude that we do not have, in this record, competent testimony upon which the State could rely to constitute a prima facie case. We do not have the medical evidence present in *Grabill, Seyle, Jones,* and *Rinehart* to the effect that the trauma was *only* consistent with child abuse in the form of physical assault. Therefore the motion for acquittal should have been granted because, under the evidence in the record when the State rested, a prima facie case had not been made.

When the State rested, I would have held that there was insufficient evidence to sustain the charges under the rule announced in *Chavez v. State,* supra.

*Sufficiency of the Evidence*

Justice Thomas has filed a concurring opinion herein where he urges that a motion for a verdict of acquittal made at the end of the State's case should not be waived if the defendant, after receiving an adverse ruling on the motion, should decide to go forward with evidence in his or her own behalf. I agree with these thoughts. The rule should be as he suggests.

It does not matter very much in this case whether the rule of our prior holdings in

*Grabill, Seyle, Jones* and *Rinehart*, the rule adopted by the majority, or the rule suggested by Justice Thomas is utilized. The question in all instances is one of sufficiency of the evidence. By introducing evidence in his own behalf in the case at bar, the defendant did nothing to fill in the gaping holes in the fabric of the State's case. The State did not make a prima facie case in its case in chief and, when all the evidence was in, there was insufficient evidence to support a guilty verdict.

We said in *Rinehart v. State*, supra: " 'The oft-repeated rule by which we test the sufficiency of evidence on appeal of a criminal matter is that we examine and accept as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith, and we give to the evidence of the prosecution every favorable inference which may reasonably and fairly be drawn therefrom. Stated another way—it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State. [Citations.]' *Harvey v. State*, Wyo., 596 P.2d 1386, 1387 (1979)." 641 P.2d at 194. See *Cloman v. State*, supra; *Grabill v. State*, supra.

In the instant matter, is the evidence sufficient to form a reasonable inference of guilt beyond a reasonable doubt when viewed in the light most favorable to the State?

I say no.

A reasonable inference of guilt beyond a reasonable doubt cannot be formulated upon opinion evidence of nonexperts [7] who have drawn their conclusions from faulty hypotheses. Furthermore, the rule announced in our previous child-abuse cases has not been complied with because qualified experts have not testified in this case that the trauma was inflicted by abusing the child. (See *Grabill*, supra, *Seyle*, supra, *Jones*, supra, and *Rinehart*, supra.) The most that can be said is that, given some but not all of the possibilities—given inaccurate physical facts about the bathtub—given the wrong age of the child—the doctors said that, in their opinion, the burns were not incurred as the defendant said they were.

This is insufficient to uphold a guilty verdict under the reasonable-doubt concept.

I would reverse.

---

**7.** These doctors were not experts in the field in which they were asked to and did offer their opinions. There was no medical controversy involved. It was a physical-fact issue.